Opinion by Judge W. FLETCHER; Dissent by Judge BEA.
OPINION
W. FLETCHER, Circuit Judge:
Petitioner James McKinney was sentenced to death, and his sentence was affirmed by the Arizona Supreme Court on de novo review in 1996. State v. McKinney, 185 Ariz. 567, 917 P.2d 1214 (1996). A three-judge panel of this court denied McKinney’s petition for a writ of habeas corpus. McKinney v. Ryan, 730 F.3d 903 (9th Cir.2013). We granted rehearing en banc and withdrew our three-judge panel opinion. McKinney v. Ryan, 745 F.3d 963 (9th Cir.2014). In his federal habeas petition, McKinney challenges both his conviction and sentence. We agree with the decision of the three-judge panel with respect to McKinney’s challenges to his conviction, and to that extent we incorporate the decision of the panel. We address in this opinion only McKinney’s challenge to his death sentence. For the reasons that follow, we grant the petition with respect to his sentence.
In Eddings v. Oklahoma, 455 U.S. 104, 114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Supreme Court held under the Eighth and Fourteenth Amendments that a sentencer in a capital case may not “refuse to consider, as a matter of law, any relevant mitigating evidence” offered by the defendant. (Emphasis in original.) Oklahoma state courts had refused, as a matter of law, to treat as relevant mitigating evidence a capital defendant’s background of family violence, including beatings by his father, on the ground that “it did not tend to provide a legal excuse from criminal responsibility.” Id. at 113, 102 S.Ct. 869. The Supreme Court reversed. Recognizing the special character of the death penalty, the Court held that evidence of Ed-dings’s background of family violence had to be treated as relevant evidence in determining whether to put him to death. The Court wrote, “The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.” Id. at 114-15,102 S.Ct. 869.
At all times relevant to this case, Arizona law provided for two kinds of mitigation factors in capital sentencing — statutory and nonstatutory. A nonexhaustive list of five statutory mitigating factors was provided in Ariz.Rev.Stat. Ann. § 13-703(G). Arizona case law applied, in addition, nonstatutory mitigating factors, such as a difficult family background or a mental condition not severe enough to qualify as a statutory mitigating factor.
For a period of a little over 15 years in capital cases, in clear violation of Eddings, the Supreme Court of Arizona articulated and applied a “causal nexus” test for non-statutory mitigation that forbade as a matter of law giving weight to mitigating evidence, such as family background or mental condition, unless the background or mental condition was causally connected to the crime. In State v. Wallace, 160 *803 Ariz. 424, 773 P.2d 983, 986 (1989), decided seven years after Eddings and four years before petitioner was sentenced, the Arizona Supreme Court wrote, “A difficult family background, in and of itself, is not a mitigating circumstance.... A difficult family background is a relevant mitigating circumstance if a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant’s control.” In State v. Ross, 180 Ariz. 598, 886 P.2d 1354, 1363 (1994), decided one year after petitioner was sentenced but before his sentence was affirmed on appeal, the Arizona Supreme Court wrote, citing the precise page in Wallace, “A difficult family background is not a relevant mitigating circumstance unless ‘a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant’s control.’ State v. Wallace, ... 160 Ariz. 424, 773 P.2d 983, 986 (1989).”
Two years after its decision in Ross, the Arizona Supreme Court affirmed McKinney’s death sentence. In addressing the potential mitigating effect of his mental condition, the Court wrote that McKinney’s PTSD had no causal nexus to his crimes. If anything, the Court wrote, “the effects of [his] childhood, specifically the diagnosis of post-traumatic stress disorder (PTSD)” would have influenced him not to commit the crimes. McKinney, 917 P.2d at 1234. The Court concluded its analysis of McKinney’s PTSD, citing the precise page in Ross on which it had articulated the causal nexus test for nonstatutory mitigation: “[A] difficult family background, including childhood abuse, does not necessarily have substantial mitigating weight absent a showing that it significantly affected or impacted the defendant’s ability to perceive, comprehend, or control his actions. See State v. Ross, ... 180 Ariz. 598, 886 P.2d 1354, 1363 (1994).” State v. McKinney, 185 Ariz. 567, 917 P.2d 1214, 1234 (1996).
For just over fifteen years, the Arizona Supreme Court consistently articulated and applied its causal nexus test, in accordance with its strong view of stare decisis. See Young v. Beck, 227 Ariz. 1, 251 P.3d 380, 385 (2011) (“[S]tare decisis commands that ‘precedents of the court should not be lightly overruled,’ and mere disagreement with those who preceded us is not enough.” (quoting State v. Salazar, 173 Ariz. 399, 416, 844 P.2d 566 ... (1992))); State ex rel. Woods v. Cohen, 173 Ariz. 497, 844 P.2d 1147, 1148 (1993) (referring to “a healthy respect for stare decisis”); State v. Williker, 107 Ariz. 611, 491 P.2d 465, 468 (1971) (referring to “a proper respect for the theory of stare decisis”); White v. Bateman, 89 Ariz. 110, 358 P.2d 712, 714 (1961) (prior case law “should be adhered to unless the reasons of the prior decisions have ceased to exist or the prior decision was clearly erroneous or manifestly wrong”).
The case before us is unusual. In federal habeas cases under the Antiterrorism and Effective Death Penalty Act (“AEDPA”), we apply a “presumption that state courts know and follow the law” and accordingly give state-court decisions “the benefit of the doubt.” Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002). If the Arizona Supreme Court during the relevant period had been inconsistent in its articulation and application of its unconstitutional “causal nexus” test for nonstatutory mitigation, we would give the Court the benefit of the doubt and would accord it the presumption that it knew and followed governing federal law. But the Arizona Supreme Court’s consistent articulation and application of its causal nexus test, and its citation in McKinney’s case to the specific page of Ross on which it articulat *804 ed the test, make such a course impossible. While Visciotti’s presumption is appropriate in the great majority of habeas cases, the presumption is rebutted here where we know, based on its own words, that the Arizona Supreme Court did not “know and follow” federal law.
The precise question before us is whether the Arizona Supreme Court applied its unconstitutional “causal nexus” test in affirming McKinney’s death sentence on de novo review. We must decide whether, under AEDPA, the Arizona Supreme Court refused to give weight, as a matter of law, to McKinney’s nonstatutory mitigation evidence of PTSD, “contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1). For the reasons that follow, we conclude that it did. We therefore grant the writ with respect to petitioner’s sentence.
I. McKinney’s Crimes, Conviction, and Sentence
James McKinney and his older half brother, Charles Michael Hedlund, committed two burglaries in February and March of 1991. One person was shot and killed during each of the burglaries. At the time of the crimes, McKinney was 23 years old. Hedlund was 26 years old. McKinney and Hedlund had learned about potential burglary targets from their half brother, Christopher Morris, and a friend, Joe Lemon, who had suggested Christine Mertens’s home as a target. The four of them attempted to burglarize Ms. Mer-tens’s home on February 28, 1991, but Ms. Mertens came home and they left to avoid detection. The three half brothers, McKinney, Hedlund, and Morris, then committed two burglaries at other locations the following day.
McKinney, Hedlund, and possibly Morris went back to Ms. Mertens’s house a little over a week later, on March 9, 1991. This time, Ms. Mertens was already at home. She was beaten and stabbed by one or more of the burglars. One of the burglars held Ms. Mertens down on the floor and shot her in the back of the head with a handgun, covering the gun with a pillow. (Morris turned state’s evidence and testified against McKinney and Hed-lund. He testified that he was at work at Burger King on the night of the Mertens murder, but Burger King had no record of him working that night.) McKinney and Hedlund later tried unsuccessfully to sell the gun. They ultimately disposed of the gun by burying it in the desert. Not quite two weeks later, on March 22, 1991, McKinney and Hedlund burglarized the home of Jim McClain, from whom Hedlund had bought a car several months earlier. Mr. McClain was asleep in the bedroom. He was shot in the back of the head by either McKinney or Hedlund. The bullet was consistent with having been fired from a sawed-off rifle owned by Hedlund.
McKinney and Hedlund were tried together before dual juries for the burglaries and homicides. McKinney’s jury found him guilty of two first degree murders. Hedlund’s jury found him guilty of second degree murder of Ms. Mertens and first degree murder of Mr. McClain. On July 23, 1993, the trial judge sentenced McKinney to death. The Supreme Court decision holding judge-sentencing in capital cases unconstitutional was nine years in the future. See Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In the last reasoned state court decision, the Arizona Supreme Court, reviewing de novo, affirmed McKinney’s conviction and sentence in 1996. McKinney, 917 P.2d 1214. We describe the Arizona Supreme Court’s sentencing decision at greater length below. McKinney filed for state post-conviction relief. His petition *805 was denied by the trial court without an evidentiary hearing. The Arizona Supreme Court then summarily denied his petition for review.
II. McKinney’s Family Background
McKinney suffered a traumatic childhood characterized by severe physical and psychological abuse, both by his biological parents, James McKinney, Sr. (“James”) and Bobbie Jean Morris, and by his stepmother, Shirley Crow McKinney. At McKinney’s sentencing hearing, his aunt (his father’s sister), Susan Sesate, and his younger sister, Diana McKinney, described the abuse.
Susan and Diana both testified about the squalid conditions in which McKinney lived as a child. Susan testified that while McKinney’s parents, James and Bobbie, were still married, their house was filthy. She testified, “[W]hen you walked through the door, it wasn’t nothing to see, you know, diapers full of — all around____Ev-erything stunk.” James was an alcoholic, and Bobbie left him when McKinney was about three years old.
When Bobbie left James, she took with her their three children, Diana, Donna, and McKinney. Susan testified, “She ran with them____She ran to a lot of different states. I know she went to California first and Kansas twice. California again. I know she went through Texas, New Mexico.” James pursued and brought Bobbie and the children back to Arizona, but “she would run again.” “As soon as he brought her back, within a week she’d be gone again to Kansas. She had the kids there.” James told McKinney’s presentence investigator that Bobbie had “kidnapped” the children, and that he took them back “after he found out they were being physically abused and were being locked in closets, hungry and sick.”
Bobbie eventually left James for good, and he got remarried. James got custody of the children and brought them to Arizona to live with him and his new wife Shirley. The conditions in the house with James and Shirley were even worse than they had been with James and Bobbie. Susan, a teenager at the time, lived with her mother (who was also James’s mother) in a house nearby. She was at the McKinney house frequently. Susan testified that the house “was gross. It was gross. I mean, the house was filthy, the kids were filthy, they never had clean clothes that I ever saw them in. If they had clothes, they were ill-fitting clothes. I mean, it was disgusting.”
McKinney, his two sisters, and his older half brother Hedlund (Bobbie’s son by a different father) shared one small bedroom. Shirley’s daughter had a bedroom to herself. Susan testified that the floor of the four children’s bedroom was always covered with dirty clothes because there were no bureaus and no hangers for the closet. There were no sheets on the beds. The children had to share their room with animals Shirley brought home, including dogs, cats, a goat, snakes, and a monkey. The animals regularly defecated and urinated in the bedroom. Diana testified that the adults never cleaned the bedroom.
Diana was 18 months old when James took the children from Bobbie and brought them to the Arizona house he shared with his new wife Shirley. Donna was three, McKinney was four or five, and Hedlund was seven. Diana and Susan testified that the four children were responsible for all general household cooking and cleaning, including cleaning up the animal feces and urine that were “all over” the house; feeding farm animals, including cows, pigs, and goats; taking care of James’s hunting dogs; doing all of their own laundry; and sometimes doing Shirley’s laundry. Diana *806 testified that she and the other children cleaned the house the best they could, but “the house still smell[ed]” all the time. Susan testified, “It was nothing to see James [Jr.] and Michael [Hedlund] standing on chairs at the stove cooking or having to stand on chairs to do the dishes” because they were too small to reach the stove and the counters. Shirley’s daughter did not have to do any chores. Shirley kept the children from attending school as punishment for various supposed infractions. Susan testified that on one occasion McKinney sat on the porch for three days while the others went to school. When Susan’s mother (McKinney’s grandmother) sent Susan over to investigate, McKinney told her that Shirley would not allow him to go to school unless Bobbie bought him a new pair of tennis shoes. Susan’s mother bought McKinney shoes so he could return to school.
The children never had regular baths and often had dirty hair. When the children went to school, they wore dirty clothes that reeked of urine from being on the bedroom floor with the animals. The children’s school sent letters home about their appearance and odor. They were regularly harassed and teased by other children. McKinney was frequently suspended for fighting on the school bus because other children made fun of his appearance and odor.
The four children suffered regular and extensive physical, verbal, and emotional abuse. Minor infractions of Shirley’s rules, such as not doing the dishes properly, resulted in beatings. Diana testified that she could not recall a time when none of the children had a welt or bruise inflicted by Shirley. Susan testified, “They had bruises all the time. It was hard to tell what were new bruises and what weren’t.” Shirley used plastic switches, cords, belts, and a hose to hit them — “anything she could get in her hands.” Diana estimated that McKinney was beaten two to three times a week. Susan testified to repeated serious beatings, including one particular beating with
[a] water hose. It was about a yard long like that (indicating), and she had like a pocket knife, and she snipped the hose and she went after him. She beat him on the back of the head, down his back, all over his legs, his arms; anything that moved, she hit him---- He had bruises for weeks after that all over him.... Michael Hedlund tried to stop her. He grabbed her arm, and so she swung back and hit him across the side of the face and bruised his face.
Hedlund left the house to live with his mother when he was 14 years old. This left McKinney, approximately age 11, as the only boy and the oldest of the three remaining children. McKinney was too young to protect either himself or his younger sisters. Diana, the younger of the two girls, described their childhood experience as “horrible. It was scary. It seems like we were all stressed out wondering when the next time we were getting beat; wondering when we were going to eat next.”
Shirley’s physical abuse was accompanied by verbal and emotional abuse. Diana testified that Shirley regularly yelled at them, telling them that they were “[s]tupid, ugly, [and] not worth anything.” Diana testified that Shirley showed consistent favoritism toward her own daughter, while treating her stepchildren as the “four bad kids.”
Shirley often locked the children out of the house for hours without food and, sometimes, water. There was a hose in the yard, but Susan testified that if Shirley “was really angry at them, they couldn’t turn the water faucet on outside and even get a drink of water, and it would be 110 *807 degrees outside.” Susan remembered one occasion seeing the four children outside on a hot Arizona summer day, clustered in the shade of an eave of the house. None of the children had shoes; the girls were wearing only underwear, and the boys were wearing cutoff shorts with no shirts. When Susan and her mother returned to their house four hours later in the middle of the afternoon, the children were still there, their faces “beet red.” They told her that they were not allowed to get any water and could not come back inside until their father got home, when he would “punish them.” On another occasion, Susan testified, Shirley “piek[ed] James [Jr.] up by the scruff of the neck” and put him out on the porch with no shoes or coat during the winter, when the frozen grass “would crunch under your feet.”
Shirley spent most of her time at home, while James was generally absent. When he was home, James drank heavily. Susan testified that James’s mother confronted him about Shirley’s physical abuse of the children, but he told her to “keep her nose out of his business.” Susan testified to an incident in which McKinney, who was in first or second grade at the time, had stolen a lunch at school because Shirley and James had not given him any lunch money. McKinney was suspended for several days. James told his son that “he wasn’t going to punish him for stealing lunch; he was going to punish him for getting caught.”
By age nine or 10, McKinney had become distant, quiet and withdrawn. He avoided other children. He began using alcohol and marijuana at age 11. He dropped out of school in the seventh grade. At about this time, he began running away from home. Diana testified that McKinney ran away four or five times. Susan remembered one incident in which, at age 11, McKinney showed up unannounced at her house in Gilbert, Arizona after traveling alone from Oklahoma, where the family had moved. McKinney had taken a bus as far as Flagstaff, but did not have enough money to go farther. He spent the next two days hitchhiking the rest of the way to Susan’s house. McKinney’s arm, shoulder, and face were bruised; he told Susan he had gotten into a fight with Shirley. Susan called his mother Bobbie on the telephone to tell her that McKinney was at her house and that he was dirty and tired, and hadn’t eaten in days. Bobbie did not come over to pick him up. She called the sheriff instead, who picked up McKinney and put him in juvenile detention.
III. McKinney’s Post-traumatic Stress Disorder
Dr. Mickey McMahon, a psychologist, made a formal diagnosis of PTSD resulting from the horrific childhood McKinney had suffered. Before arriving at his diagnosis, Dr. McMahon had spent eight and a half hours with McKinney, talking to him and administering a battery of tests. He had also spoken with Susan for an hour and with Diana for half an hour. Finally, Dr. McMahon had listened to Susan and Diana’s testimony in court before providing his own testimony. When asked, “[D]o you have any doubts about your diagnosis of James McKinney having Post-traumatic Stress Disorder?” Dr. McMahon answered, “No. None.”
Dr. McMahon testified that his diagnosis of PTSD rested not only on the abuse that McKinney himself had suffered. He testified, “We know in research that witnessing can be even more damaging than actually being the recipient of abuse.... [T]here is a helplessness that is involved when you’re witnessing ... violence and you’re too small to do anything about it.” When asked whether “violence upon his sisters and brother would be ... more traumatic *808 to him possibly than himself,” Dr. McMahon answered, “Yes.” Dr. McMahon testified that his interview with McKinney “had gone into great depth about him witnessing Dian[]a being abused and beaten by her stepmother.”
Dr. McMahon testified that McKinney’s PTSD was characterized by “flashbacks,” by “some sort of voidness, numbing, withdrawing,” and by “substance abuse.” The substances were “generally downers, opiates in prison, alcohol, marijuana.” Dr. McMahon characterized McKinney as “basically passive,” “quite submissive,” and “susceptible to manipulation, exploitation.” “He can be emotionally overwhelmed by environmental stress and act in poorly-judged ways just to [rejduce the internal emotional turmoil.” “He does not present [i]n the testing [as someone] who is ... manipulative, sensation- or thrill-seeking, and we know often that people that get involved with violent kinds of crime are thrill-seeking sociopaths. These results do not look like that. It looks the opposite of that, since these tests are pretty much consistent. He is a lo[]ner; depressed.”
When asked whether someone with PTSD would “suffer ... constantly” from it, or whether it “may rear its head under certain situations,” Dr. McMahon responded that for someone with PTSD “there is the potential for the trauma to be re-triggered, if things happen that are similar to what happened when you’re originally traumatized.” When asked about the Mertens burglary and murder, Dr. McMahon testified that if an altercation had taken place between Ms. Mertens and another person (not necessarily McKinney), it could “very possib[ly]” have “re-triggered” McKinney’s trauma and could have produced “diminished capacity.”
When asked about the McClain burglary and murder, Dr. McMahon testified that it would have been very uncharacteristic of McKinney to have shot a sleeping person. “Mr. McKinney’s test[] results, in the more than eight hours I spent with him, did not indicate that he was that thrill-seeking kind of, execution-kind of person. He’d rather withdraw from the situation.” Shooting a sleeping person “would be the exact opposite of what I would expect from Mr. McKinney.”
Dr. Steven Gray, also a psychologist, testified for the prosecution. In preparation for his testimony, Dr. Gray had reviewed two presentence reports, a report prepared by Dr. McMahon, the raw data and results of tests performed by Dr. McMahon, and McKinney’s school records. He had also interviewed McKinney in jail, in the company of one of his lawyers, for “an hour, hour-and-a-half.” Dr. Gray had not spoken with Susan, Diana, or other family members. Dr. Gray testified, “I don’t think there’s enough evidence or diagnostic materials or work that’s been done to conclusively diagnose [McKinney] as having Post-traumatic Stress Disorder.” Dr. Gray’s “tentative or provisional diagnosis” was “Antisocial Personality Disorder.”
IV. Sentencing
The verdict forms submitted to McKinney’s and Hedlund’s juries asked only for general verdicts. The prosecutor had argued to the juries that they could find McKinney and Hedlund guilty of first degree murder either because they were guilty of actually killing Ms. Mertens or Mr. McClain, or because they were guilty of felony murder. At McKinney’s sentencing hearing, the judge indicated that he believed that McKinney had shot Ms. Mer-tens and that Hedlund had shot Mr. McClain. But the judge recognized that the jury had not specifically found that McKinney had shot Ms. Mertens. The judge therefore relied on Enmund v. Flor *809 ida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), to conclude that even if McKinney had not killed either Ms. Mertens or Mr. McClain, his involvement in the crimes leading up their murders nevertheless made him death-eligible. He said with respect to the murder of Ms. Mertens, “[E]ven if [Helund] had committed the homicide of Mrs. Mertens, [McKinney] knew that [Hedlund] at the time of entering the McClain residence was capable of killing.”
When McKinney was sentenced, Arizona provided by statute a nonexhaustive list of five specific mitigating factors. See Ariz. Rev.Stat. Ann. § 13-703(G) (1993). Among the statutory mitigators was a modified form of diminished capacity, contained in § 13-703(G)(1): “The defendant’s capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution.”
Arizona law also provided for nonstatu-tory mitigating factors, such as family background or mental conditions that did not rise to the level of impairment specified in § 13-703(G)(1). For a little over fifteen years, from the late 1980s until 2006, the Arizona Supreme Court applied a “causal nexus” test to nonstatutory mitigation factors. Under this test, evidence of a difficult family background or mental disorder was not in and of itself a relevant nonstatutory mitigating factor. As a matter of Arizona law, such evidence was relevant for nonstatutory mitigation only if it had a causal effect on the defendant’s behavior in the commission of the crime at issue. Application of the causal nexus test to nonstatutory mitigation factors violated Eddings, for it resulted in Arizona courts being entirely forbidden, as a matter of state law, to treat as- a mitigating factor a family background or a mental condition that was not causally connected to a defendant’s crime.
The trial judge sentenced McKinney to death. The judge weighed what he concluded were legally relevant aggravating and mitigating circumstances. He stated that “with respect to mitigation” he “considered” the exhibits that were admitted into evidence, and that he “did take ... into consideration” the testimony of Susan Sestate, Diana McKinney, and Dr. McMahon. He stated as to McKinney’s family history, “I agree that there was evidence of a difficult family history by the defendant. However, as I’ve indicated, I do not find that [it] is a substantial mitigating factor.... ”
The judge accepted Dr. McMahon’s PTSD diagnosis, but concluded that it was not causally connected to McKinney’s criminal behavior. Twice the judge specifically addressed the relevance of McKinney’s PTSD as a potential mitigating factor. Although the judge did not expressly so state, it appears (and we are willing to assume) that he was speaking both times in the context of statutory mitigation under § 13-703(G)(1). The judge gave McKinney’s PTSD no weight as a mitigating factor.
The judge stated:
But I think more importantly than that, certainly not trying to dispute him as an expert on what all that meant, it appeared to me that Dr. McMahon did not at any time suggest in his testimony nor did I find any credible evidence to suggest that, even if the diagnosis of Post-traumatic Stress Syndrome were accurate in Mr. McKinney’s case, that [it] in any way significantly impaired Mr. McKinney’s conduct.
(Emphasis added.) He stated a short time (two transcript paragraphs) later:
*810 [I]t appeared to me that based upon all these circumstances that there simply was no substantial reason to believe that even if the trauma that Mr. McKinney had suffered in childhood had contributed to an appropriate diagnosis of Post-traumatic Stress Syndrome that it in any way affected his conduct in this case.
(Emphasis added.) Nowhere else in his sentencing colloquy did the judge specifically refer to McKinney’s PTSD and its possible mitigating effect.
The italicized language in the two paragraphs just quoted echoes the causal nexus test of the statutory mitigating factor in § 13-703(G)(1). When applied solely in the context of statutory mitigation under § 13-703(G)(1), the causal nexus test does not violate Eddings. However, the italicized language also echoes the restrictive language of Arizona’s causal nexus test applicable to nonstatutory mitigation. When applied in the context of nonstatuto-ry mitigation, the causal nexus test clearly violates Eddings.
The Arizona Supreme Court reviews capital sentences de novo, making its own determination of what constitute legally relevant aggravating and mitigating factors, and then independently weighing those factors. Ariz.Rev.Stat. Ann. § 13-755; see also McKinney, 917 P.2d at 1225. The Arizona Supreme Court affirmed McKinney’s death sentence. The Court addressed “the effects of [McKinney’s] childhood, specifically the diagnosis of post-traumatic stress disorder (PTSD).” Id. at 1234. The Court agreed with the trial judge that there was no causal nexus between McKinney’s PTSD and his crimes. Indeed, the Court went further, finding that McKinney’s PTSD would have influenced him not to commit his crimes.
In sentencing McKinney to death, the Arizona Supreme Court gave no weight to McKinney’s PTSD. It made no reference to statutory mitigation under § 13-703(G)(1). Instead, the Court recited its unconstitutional causal nexus test applicable to nonstatutory mitigation, citing the specific page of Ross on which it had articulated that test two years earlier. The Court wrote:
[T]he record shows that the judge gave full consideration to McKinney’s childhood and the expert testimony regarding the effects of that childhood, specifically the diagnosis of post-traumatic stress disorder (PTSD). Assuming the diagnoses were correct, the judge found that none of the experts testified to, and none of the evidence showed, that such conditions in any way impaired McKinney’s ability to conform his conduct to the law. The judge noted that McKinney was competent enough to have engaged in extensive and detailed preplanning of the crimes. McKinney’s expert testified that persons with PTSD tended to avoid engaging in stressful situations, such as these burglaries and murders, which are likely to trigger symptoms of the syndrome. The judge observed that McKinney’s conduct in engaging in the crimes was counter to the behavior McKinney’s expert described as expected for people with PTSD____ [A] difficult family background, including childhood abuse, does not necessarily have substantial mitigating weight absent a showing that it significantly affected or impacted the defendant’s ability to perceive, comprehend, or control his actions. See State v. Ross, 180 Ariz. 598, 607, 886 P.2d 1354,1363 (1994)[.]
McKinney, 917 P.2d at 1234 (emphasis added).
V. Deference under AEDPA
McKinney’s appeal is governed by AED-PA. Accordingly, we will not grant his *811 petition for a writ of habeas corpus unless the state’s adjudication of his claim
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
28 U.S.C. § 2254(d). We review de novo the district court’s decision whether to grant McKinney’s habeas petition. Dyer v. Hornbeck, 706 F.3d 1134, 1137 (9th Cir.2013).
Under the “contrary to” prong of § 2254(d)(1), a federal court may grant habeas relief only “if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.” Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Under the “unreasonable application” prong, a federal court may grant relief only if “the state court’s application of clearly established federal law was objectively unreasonable,” id. at 409, 120 S.Ct. 1495, such that “fairminded jurists could [not] disagree that” the arguments or theories that supported the state court’s decision were “inconsistent with the holding in a prior decision of [the Supreme] Court,” Harrington v. Richter, 562 U.S. 86, 102, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (internal quotation marks omitted).
For purposes of habeas review, we review the state court’s “last reasoned decision.” Dyer, 706 F.3d at 1137. We apply a “presumption that state courts know and follow the law.” Visciotti, 537 U.S. at 24, 123 S.Ct. 357. “[Section] 2254(d)’s ‘highly deferential standard for evaluating state-court rulings’ ... demands that state-court decisions be given the benefit of the doubt.” Id. We “are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.” Bell v. Cone, 543 U.S. 447, 455, 125 S.Ct. 847, 160 L.Ed.2d 881 (2005); see also Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (“[AEDPA] does not require citation of our cases-indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.”). We should neither engage in hyper-technical analysis nor require “formulary statement^]” that ignore “the fair import of the [state court’s] opinion.” Packer, 537 U.S. at 9, 123 S.Ct. 362. Our task is to determine what standard the state court actually applied to resolve the petitioner’s claim. See Lafler v. Cooper, — U.S. —, 132 S.Ct. 1376, 1390, 182 L.Ed.2d 398 (2012).
VI. Clearly Established Law as Determined by the Supreme Court
The Supreme Court in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and in Eddings established a clear rule governing the role of mitigating evidence in capital sentencing. In Lockett, Chief Justice Burger wrote a plurality opinion concluding that Ohio’s death penalty statute was invalid because it restricted the mitigating circumstances that could be considered by the sentencer. The plurality concluded that under the Eighth and Fourteenth Amendments, “the sentencer ... [must] not be precluded from considering, as a mitigating factor, any aspect of a defendant’s' character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death” because a rule pre *812 venting “the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant’s character and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.” 438 U.S. at 604-05, 98 S.Ct. 2954 (emphasis in original).
Four years later, in Eddings, the Court applied the principle articulated in Chief Justice Burger’s opinion in Lockett In Eddings, the sentencing judge had refused to consider evidence that Eddings had been raised in turbulent homes without supervision, had witnessed his mother’s substance abuse, and had been beaten by his father. After “weighting] the evidence of aggravating and mitigating circumstances,” the sentencing judge concluded that he could not, “in following the law ... consider the fact of this young man’s violent background.” 455 U.S. at 108-09, 102 S.Ct. 869. Although the state appeals court acknowledged Eddings’s family history and psychological and emotional disorders, it upheld his conviction because “all the evidence tends to show that [Ed-dings] knew the difference between right and wrong at the time he pulled the trigger, and that is the test of criminal responsibility in this State.” Id. at 109-10, 102 S.Ct. 869. The Supreme Court endorsed the plurality opinion in Lockett and held that
[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence .... The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.
Id. at 113-15, 102 S.Ct. 869 (emphasis in original).
The United States Supreme Court interpreted and applied the Lockett/Eddings rule in several other decisions prior to McKinney’s sentencing in 1993 and the Arizona Supreme Court’s affirmance in 1996. In those decisions, the Court reiterated its holding that the admission of relevant evidence is not enough to satisfy the Eighth and Fourteenth Amendments if the sentencer is prevented by state law from giving effect to that evidence. Because “full consideration of evidence that mitigates against the death penalty is essential if the [sentencer] is to give a ‘reasoned moral response to the defendant’s background, character, and crime,’ ” Eddings requires that “[t]he sentencer must also be able to consider and give effect to that evidence in imposing sentence.” Penry v. Lynaugh (Penry I), 492 U.S. 302, 319, 328, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), abrogated on other grounds by Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (quoting Franklin v. Lynaugh, 487 U.S. 164, 184, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (O’Connor, J., concurring in the judgment)). “[T]he State cannot channel the sentencer’s discretion, but must allow it to consider any relevant information offered by the defendant.” McCleskey v. Kemp, 481 U.S. 279, 306, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); see also Skipper v. South Carolina, 476 U.S. 1, 4-5, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (holding that even where mitigating evidence does “not relate specifically to ... [the defendant’s] culpability for the crime he committed,” the defendant is entitled to offer any evidence that “would be ‘mitigating’ in the sense that they might serve ‘as a basis for a sentence less than death’ ” (quoting Lockett, 438 U.S. at 604, 98 S.Ct. 2954)).
*813 VII. The Causal Nexus Test and Its Application Here
A. Arizona’s Test
The trial judge sentenced McKinney to death in 1993. The Arizona Supreme Court affirmed Kinney’s conviction and sentence in 1996.
As briefly described above, Arizona capital sentencing law included a statutorily specified nonexhaustive list of five mitigating factors. See Ariz.Rev.Stat. Ann. § 13-703(G) (1993). Among the statutory mitigating factors was a modified form of diminished capacity, contained in § 13-703(G)(1): “The defendant’s capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution.”
Arizona capital sentencing law also included nonstatutory mitigating factors, such as family background or mental conditions that did not rise to the level of impairment specified in § 13 — 703(G)(1). Beginning in the late 1980s, Arizona Supreme Court developed a “causal nexus” test for nonstatutory mitigation. Under this test, as we noted above, evidence of a difficult family background or a mental condition was not in and of itself relevant mitigating evidence. As a matter of Arizona law, such evidence was relevant for mitigation purposes only if it had some causal effect contributing to the defendant’s behavior in the commission of the crime at issue. Thus, while the defendant could submit evidence of his difficult family background or mental condition, the sentencing court was prohibited from treating it as legally relevant mitigation evidence unless the defendant proved a causal connection between his background or disorder and the crime. In capital cases from the late 1980s to the mid-2000s, the Arizona Supreme Court repeatedly articulated this causal nexus test for nonstatutory mitigation. The test was “contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States” in Eddings.
In the immediate aftermath of Eddings, the Arizona Supreme Court had not yet developed its causal nexus test for nonstat-utory mitigation. One year after Eddings, the Arizona Supreme Court understood and applied Eddings and Lockett correctly. In State v. McMurtrey, a capital case, the Court wrote:
[T]he sentencer may not refuse to consider, as a matter of law, relevant evidence presented in mitigation. Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)....
... If after considering the offered evidence, the court concludes that with respect to the defendant’s mental condition, it merely establishes a character or personality disorder then the court may under [State v.] Richmond, [114 Ariz. 186, 560 P.2d 41 (1976),] conclude that the mitigating circumstance in [Ariz. Rev.Stat. Ann.] § 13-703(G)(1) does not exist. In order to remain faithful to Lockett and [State v.] Watson, [120 Ariz. 441, 586 P.2d 1253 (1978),] however, the court’s inquiry may not end there. The court must consider the offered evidence ■further to determine whether it in some other way suggests that the defendant should be treated with leniency.
136 Ariz. 93, 664 P.2d 637, 646 (1983); see also State v. Gretzler, 135 Ariz. 42, 659 P.2d 1, 14 (1983).
By the late 1980s, however, the Arizona Supreme Court had begun to articulate and apply its causal nexus test to nonstatu-tory mitigation. In Wallace, decided three years before the trial judge sentenced McKinney, the Arizona Supreme Court wrote in a capital case:
*814 A difficult family background, in and of itself, is not a mitigating circumstance. If it were, nearly every defendant could point to some circumstance in his or her background that would call for mitigation. A difficult family background is a relevant mitigating circumstance if a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant’s control.... [Appellant’s] entire family background was before the court in the pre-sentence report. Appellant, however, made no claim that his family background had anything to do with the murders he committed.
Wallace, 773 P.2d at 986 (1989) (emphasis added). The Court could not have been clearer that, as a matter of law, nonstatu-tory mitigation evidence not satisfying the causal nexus test was irrelevant. This test was in direct contravention of Eddings and Lockett.
In Ross, decided two years after the trial judge sentenced McKinney, the Arizona Supreme Court wrote in another capital case, with a pin citation to the precise page in Wallace:
A difficult family background is not a relevant mitigating circumstance unless “a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant’s control.” State v. Wallace, 160 Ariz. 424, 773 P.2d 983, 986 (1989).
886 P.2d at 1363 (1994) (citation shortened) (emphasis added). Again, the Court could not have been clearer that, as a matter of law, nonstatutory mitigation evidence not satisfying the causal nexus test was irrelevant. In affirming McKinney’s death sentence in 1996, the Arizona Supreme Court cited Ross, with a pin citation to this precise page. McKinney, 917 P.2d at 1234.
Two years after affirming McKinney’s death sentence, the Arizona Supreme Court mentioned Eddings by name, in a passage manifesting its continued misreading of Eddings and Lockett. In State v. Djerf, 191 Ariz. 583, 959 P.2d 1274, 1289 (1998), the Arizona Supreme Court explained that it read Eddings and Lockett to require a sentencer to “consider” evidence offered in mitigation. In the usage of the Arizona Court, however, “considering” such evidence did not mean weighing it to determine how much mitigating effect to give it. Rather, it meant “considering” such evidence to determine whether it satisfied the causal nexus test for nonstatuto-ry mitigation. If it satisfied the test, the sentencer was required to determine how much weight, if any, to give it. If did not satisfy the test, the sentencer was required, as a matter of law, to treat it as irrelevant and to give it no weight. As the Court wrote in Djerf:
This court has held that Lockett and Eddings require only that the sentencer consider evidence proffered for mitigation. The sentencer, however, is entitled to give it the weight it deserves. Arizona law states that a difficult family background is not relevant unless the defendant can establish that his family experience is linked to his criminal behavior. Ross, 886 P.2d at 1362. The trial court considered the evidence but found it irrelevant and declined to give it weight because proof was lacking that his family background had any effect on the crimes.
Id. (emphasis added and some citations omitted).
Two years later, in State v. Hoskins, the Arizona Supreme Court reiterated what it had written in Djerf and explained the Arizona causal nexus test and its two-step process for “consideration” of mitigating evidence. The Court wrote at length:
*815 The trial court found that defendant had shown by a preponderance of the evidence that he suffered from antisocial or borderline personality disorder. But proof that such disorder exists does not of itself establish mitigation. For our purposes on review, it is essential not only that a personality disorder be shown to exist but that it be causally linked to the crime at the time the crime is committed.
A dysfunctional family background or difficult childhood can be mitigating only if the defendant can establish that early experiences, however negative, affected later criminal behavior in ways that were beyond his control. Thus, family dysfunction, as with mental impairment under the (G)(1) statute, can be mitigating only when actual causation is demonstrated between early abuses suffered and the defendant’s subsequent acts. We reaffirm that doctrine here....
... If the defendant fails to prove causation, the circumstance will not be considered mitigating. However, if the defendant proves the causal link, the court will then determine what, if any, weight to accord the circumstance in mitigation.
The dissenting opinion expresses an impassioned description of the defendant’s “horrific” childhood. We are aware of the circumstances of defendant’s upbringing and have reviewed all aspects in minute detail.... Yet, it is clear that credible evidence in this record does not establish actual nexus with the crime, and our jurisprudence requires the nexus be proven. Wallace (II), 773 P.2d at 985-86. Importantly, were we to hold otherwise, the family dysfunction factor and the impairment factor would become meaningless because virtually every homicide defendant can point to background dysfunction, abuse, or neglect as a basis for mitigation and leniency.
199 Ariz. 127, 14 P.3d 997, 1021-22 (2000) (emphasis added and some citations omitted).
The decisions of the Arizona Supreme Court make clear that family background or a mental condition could be given weight as a nonstatutory mitigating factor, but only if defendant established a causal connection between the background or condition and his criminal behavior. For a little over fifteen years, the Arizona Supreme Court routinely articulated and insisted on its unconstitutional causal nexus test, as seen in Wallace (1989), Ross (1994), Djerf (1998), and Hoskins (2000), as just described, and in many other cases. See, e.g., State v. White, 168 Ariz. 500, 815 P.2d 869, 881 (1991) (“ ‘A difficult family background, in and of itself, is not a mitigating circumstance.’ ” (quoting Wallace, 773 P.2d at 986)); State v. Brewer, 170 Ariz. 486, 826 P.2d 783, 802 (1992) (“The evidence of defendant’s troubled background establishes only that a personality disorder exists. It does not prove that, at the time of the crime, the disorder controlled defendant’s conduct or impaired his mental capacity to such a degree that leniency is required.”); State v. Bible, 175 Ariz. 549, 858 P.2d 1152, 1209 (1993) (holding that the defendant’s family history was not mitigating in part because “Defendant made no showing that any' difficult family history had anything to do with the murder” (citing Wallace, 773 P.2d at 986)); State v. Bolton, 182 Ariz. 290, 896 P.2d 830, 854 (1995) (“A difficult family background, however, is not always a mitigating circumstance. If it were, many homicide defendants could point to some circumstance in their background that would call for mitigation. A difficult *816 family background is a mitigating circumstance if a defendant can show that something in that background had an effect or impact on his behavior that was beyond his control.” (citing Wallace, 773 P.2d at 986)); State v. Stokley, 182 Ariz. 505, 898 P.2d 454, 473 (1995) (“A difficult family background alone is not a mitigating circumstance.” (citing Wallace, 773 P.2d at 986)); State v. Jones, 185 Ariz. 471, 917 P.2d 200, 219-20 (1996) (defendant’s “chaotic and abusive childhood [was] not a mitigating circumstance” because there was no causal nexus to the crime); State v. Towery, 186 Ariz. 168, 920 P.2d 290, 311 (1996) (“We have held that a difficult family background is not always entitled to great weight as a mitigating circumstance. State v. Wallace, [773 P.2d at 985-86] (‘A difficult family background is a relevant mitigating circumstance if a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant’s control.’)”); State v. Rienhardt, 190 Ariz. 579, 951 P.2d 454, 467 (1997) (“[T]his court has rejected past drug and alcohol use as a mitigating circumstance calling for leniency when there is no evidence of a causal connection between the substance abuse and the crime.”); State v. Greene, 192 Ariz. 431, 967 P.2d 106, 117 (1998) (“Greene’s mother may have introduced him to drugs, but Greene failed to show how this influenced his behavior on the night of the murder. Thus, we do not find Greene’s dysfunctional family history to be a mitigating circumstance.” (internal citation omitted)); State v. Sharp, 193 Ariz. 414, 973 P.2d 1171, 1182 (1999) (“[W]e require a causal connection to justify considering evidence of a defendant’s background as a mitigating circumstance.”); State v. Kayer, 194 Ariz. 423, 984 P.2d 31, 46 (1999) (holding that the defendant’s mental impairment “was not established as a nonstatutory mitigating factor” in part because “defendant offered no evidence to show the requisite causal nexus that mental impairment affected his judgment or his actions at the time of the murder”); State v. Martinez, 196 Ariz. 451, 999 P.2d 795, 809 (2000) (“There is simply no nexus between Martinez’ family history and his actions on the Beeline Highway. His family history, though regrettable, is not entitled to weight as a non-statutory mitigating factor.”); State v. Canez, 202 Ariz. 133, 42 P.3d 564, 594 (2002) (“[A] causal nexus between the intoxication and the offense is required to establish non-statutory impairment mitigation.”); id. at 595 (“A defendant’s difficult childhood is mitigating only where causally connected to his offense.”).
The Arizona Supreme Court articulated the causal nexus test in various ways but always to the same effect: As a matter of law, a difficult family background or mental condition did not qualify as a nonstatu-tory mitigating factor unless it had a causal effect on the defendant’s behavior in committing the crime at issue. The Arizona Court frequently stated categorically that, absent a causal nexus, would-be non-statutory mitigation was simply “not a mitigating circumstance.” Wallace, 773 P.2d at 986. Sometimes, the court stated that evidence offered as nonstatutory mitigation that did not have a causal connection to the crime should be given no “weight.” For example, as it wrote in Djerf:
Arizona law states that a difficult family background is not relevant unless the defendant can establish that his family experience is linked to his criminal behavior. The trial court considered the evidence but found it irrelevant and declined to give it weight because proof was lacking that his family background had any effect on the crimes.
Djerf, 959 P.2d at 1289 (citation omitted). Similarly, the court wrote in Martinez, *817 “There is simply no nexus between Martinez’ family history and his actions on the Beeline Highway. His family history, though regrettable, is not entitled to weight as a non-statutory mitigating factor.” Martinez, 999 P.2d at 809.
Sometimes, the Arizona Supreme Court stated that evidence of a difficult family background or mental illness was “not necessarily” or not “usually” mitigating, and then (often in the same paragraph) held as a matter of law that the evidence in the specific case before the Court was not mitigating because it had no causal connection to the crime. For example, the Court wrote in Jones,
A difficult family background is not necessarily a mitigating circumstance unless defendant can show that something in his background had an effect on his behavior that was beyond his control .... [HJowever, the trial court did not find any connection between defendant’s family background and his conduct on the night of the murders, and our review of the record does not reveal any such connection. Thus, we find that defendant’s chaotic and abusive childhood is not a mitigating circumstance.
Jones, 917 P.2d at 219-20 (emphasis added).
Similarly, the Court wrote in Hoskins, quoting an earlier case, “ ‘An abusive family background is usually given significant weight as a mitigating factor only when the abuse affected the defendant’s behavior at the time of the crime.’ ” Hoskins, 14 P.3d at 1021 (emphasis added) (quoting State v. Mann, 188 Ariz. 220, 934 P.2d 784, 795 (1997)). The court in Hoskins then went to state and apply the unconstitutional causal nexus test as a matter of law to the evidence in the case before it, writing,
[I]t is essential not only that a personality disorder be shown to exist but that it be causally linked to the crime at the time the crime is committed....
... Because defendant has not connected his anti-social or personality disorder to the car-jacking and murder, it cannot be considered a relevant mitigating circumstance....
... If the defendant fails to prove causation, the circumstance will not be considered mitigating. However, if the defendant proves the causal link, the court then will determine what, if any, weight to accord the circumstance in mitigation.
Id. at 1021-22 (emphasis added).
In the mid-2000s, after the United States Supreme Court emphatically reiterated the Eddings rule in Tennard v. Dret-ke, 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004), the Arizona Supreme Court finally abandoned its unconstitutional causal nexus test for nonstatutory mitigation. In its first post-Tennard case addressing Eddings, the Arizona Supreme Court properly stated the rule in a jury sentencing case:
While Eddings and various other Supreme Court decisions dictate a liberal rule of admissibility for mitigating evidence, they still leave it to the sentencer to “determine the weight to be given to relevant mitigating evidence.” Eddings, 455 U.S. at 114-15, 102 S.Ct. 869, 71 L.Ed.2d 1. Once the jury has heard all the defendant’s mitigation evidence, there is no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight.
State v. Anderson, 210 Ariz. 327, 111 P.3d 369, 392 (2005). A year later, in a judge-sentencing case, the Arizona Supreme Court, relying on Anderson, again properly stated the rule:
*818 We do not require that a nexus between the mitigating factors and the crime be established before we consider the mitigation evidence. See Tennard v. Dretke, 542 U.S. 274, 287, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004). But the failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence.
State v. Newell, 212 Ariz. 389, 132 P.3d 833, 849 (2006).
B. Our “Clear Indication” Test
. Not counting the case now before us, we have decided nine Arizona capital cases in which petitioners have alleged that the Arizona Supreme Court, as a matter of law, treated would-be mitigation evidence as legally irrelevant in violation of Ed-dings. In two of these cases, we held that the Arizona Supreme Court committed Ed-dings error. See Williams v. Ryan, 623 F.3d 1258 (9th Cir.2010); Styers v. Schriro, 547 F.3d 1026 (9th Cir.2008) (per curiam). In the other seven, we held that the Arizona Court had not committed Ed-dings error. In six of these, we applied a test first articulated in Schad v. Ryan, 581 F.3d 1019, 1037 (9th Cir.2009) (per curiam) (unamended opinion), under which we could not find Eddings error unless there was a “clear indication in the record” that the Arizona Court had refused, as a matter of law, to treat nonstatutory mitigation evidence as relevant unless it had some effect on the petitioner’s criminal behavior. See Hedlund v. Ryan, 750 F.3d 793, 818 (9th Cir.2014); Murray v. Schriro, 746 F.3d 418, 455 (9th Cir.2014); Clabourne v. Ryan, 745 F.3d 362, 373 (9th Cir.2014) (petition for panel rehearing and for rehearing en banc pending); Poyson v. Ryan, 743 F.3d 1185, 1188 (9th Cir.2013); Lopez v. Ryan, 630 F.3d 1198, 1203 (9th Cir.2011); Schad v. Ryan, 671 F.3d 708, 724 (9th Cir.2011) (per curiam) (amended opinion). In the seventh, we did not apply the “clear indication” test. See Towery v. Ryan, 673 F.3d 933 (9th Cir.2012). In none of the cases in which we held that there had been no Eddings error did we hold that the Arizona Supreme Court had renounced its causal nexus test. Rather, we held only that petitioners had not shown that the Court had applied the test in such a way as to treat nonstatutory mitigation evidence irrelevant as a matter of law.
In our amended opinion in Schad, we stated the “clear indication” test as follows:
Absent a clear indication in the record that the state court applied the wrong standard, we cannot assume the courts violated Edding’s constitutional mandates. See Bell v. Cone, [543 U.S. 447, 455, 125 S.Ct. 847, 160 L.Ed.2d 881] (2005) (“Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.”).
Schad, 671 F.3d at 724 (emphasis added). The language from Bell, quoted in Schad in support of its “clear indication” rule, states only that we may not presume that a state court failed to follow federal constitutional law based on “nothing more than a lack of citation.” But in Schad we broadened "the language from Bell and transformed it into a prohibition against an “assumption” of unconstitutionality in the absence of a “clear indication” to the contrary.
When used in Bell, the quoted language stated a rule that is applicable in a narrow circumstance: a federal habeas court should not presume, merely because a state court has failed to cite a federal case, that the state court was unaware of or failed to follow the rule established in that case. The Bell rule is eminently sen *819 sible. A presumption of ignorance or disregard of federal law based merely on a failure of citation by a busy state court is both unrealistic and disrespectful. But the Bell rule, as stated by the Supreme Court, has a relatively narrow application. It is not a broad rule requiring federal habeas courts to assume in all circumstances, including Eddings cases, that absent a “clear indication” to the contrary, a state understood and properly applied federal law.
Congress knows how to limit federal collateral review by requiring deference to state court decisions, and it has done so in AEDPA. Under 28 U.S.C. § 2254(d), federal courts shall not issue writs of habeas corpus on any claim adjudicated in state court unless the adjudication “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law” or “that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” Section 2254(d) is already a form of a clear statement or a clear indication rule, which all federal courts are required to follow. The “clear indication” rule stated by our circuit for the first time in Schad, and applicable in our circuit only in Eddings cases, is an inappropriate and unnecessary gloss on the deference already required under § 2254(d). We therefore overrule Schad, and the cases that have followed it, with respect to the “clear indication” test.
C. Application of the Causal Nexus Test in This Case
For the reasons that follow, we conclude that the Arizona Supreme Court applied its unconstitutional causal nexus test to McKinney’s PTSD, refusing, as a matter of law, to treat it as a relevant nonstatutory mitigating factor. This was contrary to clearly established federal law as established in Eddings.
We review the decision of the highest state court to have provided a reasoned decision. Ylst v. Nunnemaker, 501 U.S. 797, 804-06, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). The Arizona Supreme Court reviews capital sentences de novo, making its own determination of what constitute legally relevant aggravating and mitigating factors, and then weighing those factors independently. Ariz.Rev. Stat. Ann. § 13-755. The Arizona Supreme Court “conducts a thorough and independent review of the record and of the aggravating and mitigating evidence to determine whether the sentence is justified.” McKinney, 917 P.2d at 1225. The Court “considers the quality and strength, not simply the number, of aggravating or mitigating factors.” Id.
In reviewing the de novo sentencing decision of the Arizona Supreme Court, we look only to the decision of that Court. We look to the decision of the sentencing judge only to the degree it was adopted or substantially incorporated by the Arizona Supreme Court. See Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir.2005) (holding that when “the last reasoned decision adopted or substantially incorporated the reasoning from a previous decision,” it is “reasonable for the reviewing court to look at both decisions to fully ascertain the reasoning of the last decision”). The sentencing judge accepted the factual accuracy of Dr. McMahon’s diagnosis of PTSD, saying that he was “certainly not trying to dispute him as an expert on what all that meant.” The judge then went on to say that “Dr. McMahon did not at any time suggest in his testimony nor did I find any credible evidence to suggest that, even if the diagnosis of Post-traumatic Stress Syndrome were accurate in Mr. McKinney’s case, that it in any way significantly impaired Mr. McKinney’s conduct.” (Emphasis added.) He further stated:
*820 [I]t appeared to me that based upon all these circumstances that there simply was no substantial reason to believe that even if the trauma that Mr. McKinney had suffered in childhood had contributed to an appropriate diagnosis of Post-traumatic Stress Syndrome that it in any way affected his conduct in this case.
(Emphasis added.) The italicized language echoes the language of Arizona’s statutory mitigator under Ariz.Rev.Stat. § 13-703(G)(1). It also echoes the language used by the Arizona Supreme Court to articulate the unconstitutional causal nexus test applied to nonstatutory mitigation. See, e.g., Wallace, 773 P.2d at 986 (“A difficult family background is a relevant mitigating circumstance if a defendant can show that something in that back ground had an effect or impact on his behavior that was beyond his control.”) (emphasis added).
The Arizona Supreme Court affirmed McKinney’s death sentence in 1996, roughly in the middle of the fifteen-year-plus period during which it insisted on its unconstitutional nexus test for nonstatutory mitigation. The Court reviewed in its opinion the death sentences of both Hed-lund and McKinney. The Court first affirmed Hedlund’s death sentence, writing, “A difficult family background, including childhood abuse, does not necessarily have substantial mitigating weight absent a showing that it significantly affected or impacted a defendant’s ability to perceive, to comprehend, or to control his actions. See State v. Ross, ... 180 Ariz. 598, 886 P.2d 1354, 1363 (1994).” McKinney, 917 P.2d at 1226. As we pointed out above, the pin citation to Ross is a citation to the precise page on which the Arizona Supreme Court had two years earlier articulated its unconstitutional “causal nexus” test for non-statutory mitigation.
When the Arizona Supreme Court reviewed McKinney’s death sentence, it again relied on Ross. The Court wrote that the sentencing judge had given “full consideration” to McKinney’s childhood and resulting PTSD, using the word “consideration” in the sense of considering whether the evidence was, or was not mitigating. See Djerf 959 P.2d at 1289 (“This court has held that Lockett and Eddings require only that the sentencer consider evidence proffered for mitigation. The sentencer, however, is entitled to give it the weight it deserves. Arizona law states that a difficult family background is not relevant unless the defendant can establish that his family experience is linked to his criminal behavior.”) (emphasis added).
Reviewing McKinney’s sentence de novo, the Arizona Supreme Court addressed “the effects of [McKinney’s] childhood, specifically the diagnosis of post-traumatic stress disorder (PTSD).” McKinney, 917 P.2d at 1234. The Court accepted the conclusion of the sentencing judge that, as a factual matter, McKinney had not shown that his PTSD had causally contributed to the murders of Mertens and McClain. Indeed, the Arizona Supreme Court went further, pointing out that McKinney’s PTSD, if anything, would have had the opposite effect, influencing him not to have committed the murders. Because the Court concluded that McKinney’s PTSD was not causally connected to his crimes, it refused, as a matter of law, to treat his PTSD as a mitigating factor. After describing McKinney’s PTSD evidence and assessing de novo the effect of his PTSD on his behavior, the Court recited its causal nexus test. The Court concluded with a pin citation to the precise page in Ross on which, two years earlier, it had articulated the causal nexus test for nonstatutory mitigation.
We quote in full the relevant paragraph:
*821 Here again, the record shows that the judge gave full consideration to McKinney’s childhood and the expert testimony regarding the effects of that childhood, specifically the diagnosis of post-traumatic stress disorder (PTSD). Assuming the diagnoses were correct, the judge found that none of the experts testified to, and none of the evidence showed, that such conditions in any way impaired McKinney’s ability to conform his conduct to the law. The judge noted that McKinney was competent enough to have engaged in extensive and detailed preplanning of the crimes. McKinney’s expert testified that persons with PTSD tended to avoid engaging in stressful situations, such as these burglaries and murders, which are likely to trigger symptoms of the syndrome. The judge observed that McKinney’s conduct in engaging in the crimes was counter to the behavior McKinney’s expert described as expected for people with PTSD. As we noted in discussing Hedlund’s claim on this same issue, a difficult family background, including childhood abuse, does not necessarily have substantial mitigating weight absent a showing that it significantly affected or impacted the defendant’s ability to perceive, comprehend, or control his actions. See State v. Ross, ... 180 Ariz. 598, 886 P.2d 1354, 1363 (1994)[.]
Id. at 1234 (emphasis added).
Based on (1) the factual conclusion by the sentencing judge, which the Arizona Supreme Court accepted, that McKinney’s PTSD did not “in any way affect[] his conduct in this case,” (2) the Arizona Supreme Court’s additional factual conclusion that, if anything, McKinney’s PTSD would have influenced him not to commit the crimes, and (3) the Arizona Supreme Court’s recital of the causal nexus test for nonstatutory mitigation and its pin citation to the precise page in Ross where it had previously articulated that test, we conclude that the Arizona Supreme Court held, as a matter of law, that McKinney’s PTSD was not a nonstatutory mitigating factor, and that it therefore gave it no weight. This holding was contrary to Ed-dings. We therefore hold that the decision of the Arizona Supreme Court applied a rule that was “contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1).
D. Structural or Harmless Error
We have not heretofore decided whether an Eddings error is structural error. We do so now and conclude that it is not.
The Supreme Court has consistently characterized structural errors as “structural defects in the constitution of the trial mechanism.” Brecht v. Abrahamson, 507 U.S. 619, 629, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Because such errors go to the framework within which judicial proceedings are conducted, they “infect the entire trial process” and accordingly require “automatic reversal of the conviction.” Id. at 629-30, 113 S.Ct. 1710; see also Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (noting that structural errors “affeet[ ] the framework within which the trial proceeds”). Some structural errors produce a fundamentally flawed record, so “any inquiry into [their] effect[s] on the outcome of the case would be purely speculative.” Satterwhite v. Texas, 486 U.S. 249, 256, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988); see also Rose v. Clark, 478 U.S. 570, 579 & n. 7, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (holding that harmless-error analysis was appropriate because “[ujnlike errors such as judicial bias or denial of counsel, the error in this case did not affect the compo *822 sition of the record. Evaluation of whether the error prejudiced respondent thus does not require any difficult inquiries concerning matters that might have been, but were not, placed in evidence”).
By contrast, harmless-error analysis applies to trial errors, “which may ... be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless.” Fulminante, 499 U.S. at 307-08, 111 S.Ct. 1246. Because “the error occurs at trial and its scope is readily identifiable[,] ... the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury.” Holloway v. Arkansas, 435 U.S. 475, 490, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). For example, in Satterwhite, the Court applied harmless-error analysis to a Sixth Amendment error resulting in the improper admission of testimony from a psychiatrist who had examined Satterwhite without notifying his attorney. 486 U.S. at 258, 108 S.Ct. 1792. The Court noted that “the evaluation of the consequences of an error in the sentencing phase of a capital case may be more difficult because of the discretion that is given to the sentencer.” Id. However, it held that the error at issue was subject to harmless-error analysis because the admission of testimony was an error of limited scope that was ready identifiable and whose impact could be assessed by a reviewing court. Id. at 257-58, 108 S.Ct. 1792.
E. Harmless Error
The harmless-error standard on habeas review provides that “relief must be granted” if the error “ ‘had substantial and injurious effect or influence in determining the jury’s verdict.’ ” Brecht, 507 U.S. at 623, 113 S.Ct. 1710 (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). “Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice.” Id. at 637, 113 S.Ct. 1710 (internal quotation marks omitted). But, as with the stricter Chapman standard, the “risk of doubt” is placed “on the State.” O’Neal v. McAninch, 513 U.S. 432, 439, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). On federal habeas, in the absence of structural error that requires automatic reversal, “relief is appropriate only if the prosecutor cannot demonstrate harmless error.” Ayala v. Davis, — U.S.—, 135 S.Ct. 2187, 2197, 192 L.Ed.2d 323 (2015).
The Court explained in Kotteakos,
[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.
328 U.S. at 765, 66 S.Ct. 1239. Accordingly; “[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had ‘substantial and injurious effect or influence in determining the jury’s verdict,’ that error is not harmless. And, the petitioner must win.” O’Neal, 513 U.S. at 436, 115 S.Ct. 992.
We hold that the Eddings error committed by the Arizona Supreme Court in this case had a “substantial and injuri *823 ous effect” on McKinney’s sentence within the meaning of Brecht. McKinney presented evidence of severe, prolonged childhood abuse that, in the words of the sentencing judge, was “beyond the comprehension and understanding of most people.” Dr. McMahon diagnosed McKinney as suffering from PTSD as a result of his horrific childhood. McKinney’s PTSD was important mitigating evidence, central to his plea for leniency, but the Arizona Supreme Court, as a matter of law, gave it no weight. See Coleman v. Calderon, 210 F.3d 1047, 1051 (9th Cir.2000) (constitutionally infirm jury instruction was not harmless because “it undermined the very core of Coleman’s plea for life”). We hold here, as we did in Styers, that PTSD is mitigating evidence under Eddings. Styers, 547 F.3d at 1035-36 (granting the writ based on Eddings error by the Arizona Supreme Court in treating PTSD mitigation evidence irrelevant as a matter of law). We hold, further, as we also did in Styers, that the Arizona Supreme Court’s refusal, as matter of law, to give weight to petitioner’s PTSD, requires re-sentencing. Id.
“[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.” Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); see also Lockett, 438 U.S. at 605, 98 S.Ct. 2954 (“Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases.”). When a defendant’s life is at stake, the Supreme Court has consistently emphasized the importance of a properly informed, individualized sentencing determination. See, e.g., Abdul-Kabir v. Quarterman, 550 U.S. 233, 264, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007) (noting that Lockett and its progeny “have made clear that when the jury is not permitted to give meaningful effect or a ‘reasoned moral response’ to a defendant’s mitigating evidence ... the sentencing process is fatally flawed”); Satterwhite, 486 U.S. at 258, 108 S.Ct. 1792 (“It is important to avoid error in capital sentencing proceedings.”); McCleskey, 481 U.S. at 304, 107 S.Ct. 1756; Lockett, 438 U.S. at 604, 98 S.Ct. 2954 (‘We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed.”).
We recognize that there were important aggravating factors in this case. Although the jury had not found that McKinney had himself killed either Ms. Mertens or Mr. McClain, the sentencing judge concluded, based on substantial evidence, that McKinney had killed Ms. Mertens, though not Mr. McClain. Further, McKinney had been involved, as either the actual killer or as an accessory, in two murders; the murders had been done for pecuniary gain; and there had been cruelty to Mertens in the struggle preceding her death. We do not give “short shrift” to, or minimize the importance of, these aggravating factors. Bobby v. Van Hook, 558 U.S. 4, 13, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009) (per cu-riam). But we conclude that McKinney’s evidence of PTSD resulting from sustained, severe childhood abuse would have had a substantial impact on a capital sen-tencer who was permitted to evaluate and give appropriate weight to it as a nonstatu-tory mitigating factor. We conclude in this case that the Arizona Supreme Court’s application of its causal nexus test to exclude, as a matter or law, evidence of McKinney’s PTSD was “contrary to ... *824 clearly established Federal law, as determined by the Supreme Court of the United States,” and that its application of the test had a “substantial and injurious effect or influence” on its decision to sentence McKinney to death. Brecht, 507 U.S. at 623, 113 S.Ct. 1710 (internal quotation marks omitted).
VIII. Response to Dissent
The foregoing opinion speaks for itself, but we add a few words to respond directly to two contentions in the dissent with which we particularly disagree.
A. Consistent Articulation and Application of the Causal Nexus Test
First, the dissent contends that during the relevant period the Arizona Supreme Court was inconsistent in its articulation and application of its unconstitutional causal nexus test for nonstatutory mitigation. We disagree. As we discuss in the body of our opinion, the Arizona Supreme Court, during a period of just over fifteen years, consistently insisted upon and applied its causal nexus test to nonstatutory mitigation. In no case during this period did the Court give any indication that the causal nexus test was not the law in Arizona, or any indication that it had the slightest doubt about the constitutionality of the test.
The dissent particularly relies on four Arizona Supreme Court cases. Dissent at 842-46. Those cases are State v. Towery, 186 Ariz. 168, 920 P.2d 290 (1996), State v. Thornton, 187 Ariz. 325, 929 P.2d 676 (1996), State v. Gonzales, 181 Ariz. 502, 892 P.2d 838 (1995), and State v. Trostle, 191 Ariz. 4, 951 P.2d 869 (1997). None of the four cases even remotely supports the dissent’s contention.
Of the four cases, the dissent emphasizes Towery. Dissent at 842-43. In Tow-ery, however, the Arizona Supreme Court clearly articulated and applied its causal nexus test. The defendant in Towery had introduced, as a would-be mitigating factor, evidence of his difficult family background. The sentencing judge “rejected the evidence as a mitigating factor because [Towery] failed to establish a nexus between his family background and his crime.” Towery, 920 P.2d at 310. The Arizona Supreme Court, on de novo review, affirmed the death sentence. It wrote:
We have held that a difficult family background is not always entitled to great weight as a mitigating circumstance. State v. Wallace, ... 160 Ariz. 424, 773 P.2d 983, 985-86 (1989) (“A difficult family background is a relevant mitigating circumstance if a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant’s control.”)[.] We have since reaffirmed that family background may be a substantial mitigating circumstance when it is shown to have some connection with the defendant’s offense-related conduct. White, ... 815 P.2d at 881-82.
Defendant has failed to connect his family background to his criminal conduct.
Id. at 311 (citations shortened). The Court in Towery could hardly have been clearer. It both articulated and applied its unconstitutional causal nexus test to treat as irrelevant, as a matter of law, nonstatu-tory mitigation evidence of the defendant’s family background because he had “failed to connect his family background to his criminal conduct.” Our three-judge panel decision, reviewing Towery’s conviction and sentence on federal habeas, held to the contrary, but it was mistaken in so holding. See Towery v. Ryan, 673 F.3d 933 (9th Cir.2012).
The other three cases are of no greater help to the dissent. In Thornton, the sen *825 tencing judge had given mitigating weight to defendant’s “traumatic childhood, dysfunctional family, and antisocial personality disorder,” as it was permitted to do under .Arizona law provided there was a causal nexus to the crime. The Arizona Supreme Court affirmed the judge on this point. It did not recite whether the judge had found a causal nexus; it simply affirmed without comment. The defendant contended that the sentencing judge should also have given weight to four other nonstatutory mitigating factors — mental illness, remorse, cooperation, and character. The Arizona Supreme Court rejected the contention that any of these factors were mitigating. It rejected three of them on the ground that they did not exist as a •factual matter. It rejected the fourth with a citation to the precise page in Ross in which it had articulated its unconstitutional causal nexus test. In Gonzales, defendant contended his good character should have been given mitigating weight. The Arizona Supreme Court rejected the contention, holding as a factual matter that Gonzales did not have good character. In Trostle, the Arizona Supreme Court gave mitigating weight to the defendant’s mental impairment because the causal nexus test was satisfied. The Court wrote,
[W]eight to be given to mental impairment should be proportional to a defendant’s ability to conform or appreciate the wrongfulness of his conduct.
The defendant here established ... that he was affected in no small measure by an impaired ability to conform his conduct to the law’s requirements.... The trial court, therefore, should have given serious consideration to this evidence, either as statutory or nonstatuto-ry mitigation.
951 P.2d at 886.
The dissent also relies on two cases cited in Lopez v. Ryan, 630 F.3d 1198, 1204 n. 4 (9th Cir.2011) — State v. Mann, 188 Ariz. 220, 934 P.2d 784 (1997); and State v. Medrano, 185 Ariz. 192, 914 P.2d 225 (1996). Neither case supports the dissent’s contention.
In State v. Mann, the defendant had advanced four proposed nonstatutory miti-gators: (1) the possibility of consecutive life sentences rather than the death penalty; (2) defendant’s relationship to his children;- (3) a change in defendant’s “lifestyle” after he committed the murders; and (4) defendant’s difficult family background. 934 P.2d at 795. The Arizona Supreme Court held as a matter of law that the possibility of consecutive life sentences was “a sentencing option” rather than a mitigating factor. Id. With respect to defendant’s relationship with his children and his change in lifestyle, the Court held that the defendant had not “established mitigation of sufficient weight to call for leniency.” Id. Finally, the Court held that defendant’s difficult family background was irrelevant as a matter of law. It recited its causal nexus test, citing the precise page in its Wallace opinion on which it had articulated and applied the test. The Court then wrote, “Defendant did not show any connection.” Id.
In State v. Medrano, the defendant contended that his cocaine intoxication was both a statutory and nonstatutory mitigating factor. The sentencing judge had found as a factual matter that defendant’s cocaine intoxication had not affected his behavior in committing the crime. The Arizona Supreme Court applied .the causal nexus test, writing that the sentencing judge had found that the defendant had “not proven by a preponderance of the evidence, either as a statutory or nonstatu-tory mitigating factor, that cocaine intoxication had contributed to his conduct on *826 the night of the murder.” 914 P.2d at 227. The Arizona Supreme Court accepted the factual finding of the sentencing judge that there had been no causal nexus. The Court wrote that defendant’s evidence was “unpersuasive” and that his cocaine use therefore “fail[ed] as a non-statutory mitigating circumstance.” Id. at 229.
As we noted at the beginning of our opinion, the Arizona Supreme Court has a strong view of stare decisis. The Court wrote in White v. Bateman, 89 Ariz. 110, 358 P.2d 712, 714 (1961), for example, that its prior case law “should be adhered to unless the reasons of the prior decisions have ceased to exist or the prior decision was clearly erroneous or manifestly wrong.” See also Young v. Beck, 227 Ariz. 1, 251 P.3d 380, 385 (2011) (“[S]tare decisis commands that ‘precedents of the court should not be lightly overruled,’ and mere disagreement with those who preceded us is not enough.” (quoting State v. Salazar, 173 Ariz. 399, 416, 844 P.2d 566 ... (1992))); State ex rel. Woods v. Cohen, 173 Ariz. 497, 844 P.2d 1147, 1148 (1993) (referring to “a healthy respect for stare deci-sis”); State v. Williker, 107 Ariz. 611, 491 P.2d 465, 468 (1971) (referring to “a proper respect for the theory of stare decisis”).
Consistent with its view of stare decisis, the Arizona Supreme Court applied its unconstitutional causal nexus test consistently throughout during the relevant period. We would hardly expect the Court have done otherwise, given its view of stare decisis and the causal nexus test. The test was, of course, premised on a mistaken understanding of Eddings. The Court corrected its mistake, consistent with its view of stare decisis under Bate-man (“the prior .decision was clearly erroneous or manifestly wrong”), after the United States Supreme Court emphatically reiterated the Eddings rule in 2004 in Tennard v. Dretke. See State v. Anderson, 210 Ariz. 327, 111 P.3d 369 (2005). But a mistake is only a mistake. All courts, even very good courts, make mistakes. A good court, however, does not apply an established rule erratically, enforcing it arbitrarily in some cases but not in others. We have great respect for the Supreme Court of Arizona, whose institutional integrity is demonstrated, inter alia, by the consistent application of the causal nexus test during the fifteen-year period it was in effect.
B. Appellate Review and “Unreasonable Determination of Fact”
Second, the dissent contends that the critical question before us is whether the Arizona Supreme Court properly concluded that the sentencing judge “fully considered McKinney’s PTSD.” Dissent at 839. It further contends that we must review whether the Court properly so concluded under the “unreasonable determination of fact” standard of AEDPA. 28 U.S.C. § 2254(d)(2). According to the dissent, the Arizona Supreme Court did not unreasonably make the factual determination that the sentencing judge had “fully considered McKinney’s PTSD.” Therefore, according to the dissent, we must uphold the sentencing decision of the Arizona Supreme Court. The dissent misunderstands both the significance of the Arizona Supreme Court’s de novo review in capital cases, and the “unreasonable determination of fact” standard of review under AEDPA.
Contrary to the view of the dissent, the Arizona Supreme Court in reviewing capital sentences does not base its decision on whether the sentencing judge fully considered aggravating and mitigating factors. Rather, as we indicated above, the Arizona Supreme Court reviews capital sentences de novo, making its own independent determination of what constitute legally rele *827 vant aggravating and mitigating factors, and then performing an independent weighing of those factors. In its own words, the Arizona Supreme Court “conducts a thorough and independent review of the record and of the aggravating and mitigating evidence to determine whether the sentence is justified, ... considering] the quality and strength, not simply the number, of aggravating or mitigating factors.” McKinney, 917 P.2d at 1225.
Further, and also contrary to the view of the dissent, the question whether the sentencing judge “fully considered McKinney’s. PTSD” is not a question of “fact” under § 2254(d)(2). A “fact” under § 2254(d)(2) is an evidentiary fact, such as whether a defendant had PTSD or whether a defendant’s PTSD had a causal nexus to the crime. See, e.g., Wood v. Allen, 558 U.S. 290, 130 S.Ct. 841, 850, 175 L.Ed.2d 738 (2010) (analyzing evidentiary facts under § 2254(d)(2)). Whether a sentencing judge fully considered an evidentiary fact is not a “fact” within the meaning of § 2254(d)(2).
Conclusion
We review the decision of the Arizona Supreme Court, as the last reasoned state court decision. The Arizona Supreme Court reviewed McKinney’s death sentence de novo. That Court accepted the factual conclusion of the trial judge that, as an evidentiary matter, there was no causal nexus between McKinney’s PTSD and his crimes. After accepting the conclusion of the trial judge on this factual point, the Court went further, noting that, far from contributing to his crimes, McKinney’s PTSD would have influenced him not to commit them. The Arizona Supreme Court then recited its unconstitutional causal nexus test for nonstatutory mitigation, followed by a pin citation to the page of Ross on which it had articulated that test two years earlier, making clear that, as matter of Arizona law, McKinney’s PTSD was not relevant as a nonstatutory mitigating factor.
We reverse the district court’s judgment denying the writ of habeas corpus. We remand with instructions to grant the writ with respect to McKinney’s sentence unless the state, within a reasonable period, either corrects the constitutional error in his death sentence or vacates the sentence and imposes a lesser sentence consistent with law.